**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Rabie Chillmon,

    *Plaintiff,*

v.

Village of Evergreen Park Illinois,

    *Defendant.*

No. 20 CV 7379

Judge Lindsay C. Jenkins

**MEMORANDUM OPINION AND ORDER**

    Rabie Chillmon brings this Title VII lawsuit against the Village of Evergreen Park for national-origin discrimination, hostile work environment, and retaliation. [Dkt. 1.] Before the Court is Evergreen Park's motion for summary judgment. [Dkt. 38.] For the reasons stated below, the motion is granted in part and denied in part.

**I.    Background**

    The parties share little common ground besides agreeing that "virtually every single fact in this case is disputed." [Dkt. 39 at 2; *accord* Dkt. 52 at 2.] Rather than attempt to recount the undisputed facts and note points of dispute, the Court draws on the parties' Local Rule 56.1 statements to briefly describe the events at issue. It defers discussing the facts in greater detail until later.

    Chillmon is ethnically Albanian; she speaks English with an accent. [Dkt. 50 ¶¶ 1, 4.] She immigrated to the United States in 2011, became a U.S. citizen, and began working for Evergreen Park as a full-time records clerk on July 1, 2019. [*Id.*] She soon began having problems with her coworkers and supervisors, primarily fellow records clerks Anne Walusek and Laurie Snyder, who allegedly refused to help

Chillmon learn the job, said disparaging things about immigrants, and mocked Chillmon's accent [*id.* ¶¶ 7, 9, 11, 13–15, 18], and her direct supervisor, Frank Clarin, the supervisor of records [*id.* ¶ 2]. Chillmon alleges that Clarin disparaged her English ability, was disproportionately critical of mistakes she made in the department's daily bulletin, subjected her to harsher scrutiny and discipline than other clerks, and screamed at her in a meeting. [*Id.* ¶¶ 44, 73–74; Dkt. 56 ¶ 36.]

During her employment at Evergreen Park, Chillmon made several complaints of discrimination and harassment to Clarin and other supervisors, but no one was disciplined in response to these complaints. [*E.g.*, Dkt. 50 ¶¶ 19, 26, 42.] Michael Saunders, the chief of police, met with Chillmon about her allegations on January 6, 2020. [*Id.* ¶ 59.] According to Chillmon, this meeting was an interrogation; Saunders said that he did not believe her, that she would have to take a polygraph test to prove she was telling the truth, and that Saunders would "make sure you are going to have a very hard time to find a good job." [*Id.* ¶¶ 59–60 (cleaned up).] Chillmon initially agreed to take the polygraph, as did Walusek and Snyder, but these tests never occurred because Chillmon's counsel objected. [*Id.* ¶ 61; Dkt. 40-10 at 8–9.]

On January 23, 2020, Clarin and Sergeant Salazar met with Chillmon to discuss errors she made in the daily bulletin. [Dkt. 50 ¶ 66.] During this meeting, Clarin and Salazar say that Chillmon became aggressive and defensive; Chillmon alleges that she was merely questioning why she was being singled out and that Clarin was screaming. [*Id.*] Clarin and Salazar believed Chillmon was being insubordinate, and they wrote memos describing the meeting and sent them to

Deputy Chief Donovan. [*Id.* ¶ 67.] Saunders reviewed the memos; watched soundless video footage of the meeting, the angle of which showed only Chillmon; and met with Chillmon on January 24, 2020. [*Id.* ¶ 68.] Saunders gave Chillmon a written reprimand for the bulletin errors and a one-day suspension for insubordination. [*Id.* ¶ 69.]

Chillmon filed a charge with the Equal Employment Opportunity Commission ("EEOC"), which Saunders received notice of on March 5, 2020. He created notes regarding his knowledge of the relevant issues the next day. [*Id.* ¶ 75.]

In late March 2020, Chillmon reported that on March 25, Snyder told her to "shut up." [*Id.* ¶¶ 76–78.] Chillmon and Snyder were interviewed regarding the incident [*id.* ¶ 78], and Donovan reviewed video footage, with sound; he concluded in a memo that Snyder could not be heard saying "shut up" [*id.* ¶ 77; Dkt. 40-9 at 75–76]. Saunders reviewed Donovan's memo and the video footage; concluded that Chillmon had lied about hearing Snyder say, "shut up"; and terminated Chillmon on March 31, 2020. [Dkt. 50 ¶ 79.]

Chillmon filed this lawsuit against Evergreen Park on December 14, 2020. [Dkt. 1.] She alleges that she was discriminated against and subjected to a hostile work environment because her national origin, in violation of Title VII of the Civil Rights Act of 1964, and retaliated against for engaging in activity that is protected by that statute. Evergreen Park now moves for summary judgment. [Dkt. 38.]

## II.    Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (internal quotation omitted).

## III. Analysis

Chillmon brings Title VII claims for hostile work environment, discrimination, and retaliation. Below, the Court presents the most favorable version of the evidence for Chillmon while largely omitting Evergreen Park's side of the story. In the interest of brevity, the Court does not mention every disputed point of fact. Suffice it to say that the Court takes no position on the truth or falsity of the facts discussed below—such determinations are the jury's role. As explained below, Evergreen Park is entitled to summary judgment on Chillmon's discrimination claim and portions of her hostile work environment and retaliation claims. Other aspects of these claims will be for a jury to decide at trial.

### A. Hostile Work Environment

The Court begins with Chillmon's claim that she was subjected to a hostile work environment based on her national origin. [Dkt. 1 ¶¶ 37, 40.] Title VII's

prohibition on employers discriminating against employees on the basis of national origin "also reaches the creation of a hostile or abusive work environment permeated with discriminatory intimidation, ridicule, and insult." *Trahanas v. Nw. Univ.*, 64 F.4th 842, 853 (7th Cir. 2023) (cleaned up); *see* 42 U.S.C. § 2000e-2(a)(1). "To establish a hostile work environment claim, a plaintiff must show: (1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on [national origin]; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Id.* (citation omitted). Whether there is a basis for employer liability "depend[s] on whether the alleged harasser is the victim's supervisor or coworker." *Id.* (citation omitted). In contrast to when the harassment comes from a supervisor, "when the harasser is a coworker, 'the employer is liable only if it was negligent in controlling working conditions.'" *Id.* (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)).

Chillmon bases her hostile work environment claim on both supervisor and coworker harassment, so the Court addresses Evergreen Park's potential liability on these theories separately. *See id.* at 853–55.[1]

---

[1]     Chillmon correctly notes that under the applicable totality-of-the-circumstances test, it is inappropriate to "carve up incidents of harassment and then separately analyze each incident." [Dkt. 52 at 2–3.] But "courts consider the totality of the circumstances when determining whether conduct is severe or pervasive," *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1116 (7th Cir. 2022) (citation omitted), not when analyzing whether there is a basis for employer liability. If a supervisor "quickly remedie[s]" coworker discrimination, that discrimination cannot support a hostile work environment claim against the employer. *See Brooks v. Avancez*, 39 F.4th 424, 438–39, 441 (7th Cir. 2022) (explaining this concept in the analogous Age Discrimination in Employment Act context and applying that analysis to a hostile work environment claim); *see also Trahanas*, 64 F.4th at 853 (defense is inapplicable for supervisor harassment). To the extent that Chillmon's hostile work environment claim is

### 1.      Coworker Harassment

Viewed in the light most favorable to Chillmon, the record supports national-origin discrimination by her coworkers early in her employment. In July 2019, Chillmon's first trainer, Walusek, ignored her questions. [Dkt. 40-1 ("Chillmon Dep.") at 14:18–:23.] When Chillmon pressed for answers, Walusek responded that if Chillmon thought she wouldn't be able to learn how to do the job, she should quit: "[I]t's easy for you. Just go ahead and live on food stamps just like every other immigrant." [*Id.* at 15:2–:18.] Further, during a performance review, Walusek implied that she could cause Chillmon to be fired. [*Id.* at 86:12–88:6.]

In August 2019, Snyder began training Chillmon, but Snyder also rebuffed Chillmon's questions, saying, "Rabie, I don't have time for you. We have our jobs. You should have stayed with Anne." [*Id.* at 21:17–22:3.] On one occasion, Chillmon said it was good to "help[ ] people," to which Snyder allegedly responded:

> [Y]es, Rabie, people, but people from here. Not people from other countries. … I hate people from other countries who come here, take[ ] our good jobs, good benefits. You all need to stay in your own fucking country … and build your own country. … [M]y stomach hurts just thinking about people from other countries.

[*Id.* at 22:11–:23.] While saying this, Snyder "stood up from her chair and [came] directly" at Chillmon, looking angry. [*Id.* at 25:11–:14.] Further, Snyder and Walusek would mock Chillmon's accent when Chillmon tried to ask questions, saying things like, "What the fuck is she saying? Girl, speak English. We don't understand your

---

based on coworker harassment, it is essential to analyze whether Evergreen Park took sufficient remedial steps to avoid liability.

accent. … [D]o you actually understand her? … [G]irl, no. I don't understand what she's talking about." [*Id.* at 24:1–:10.]

Evergreen Park argues that this conduct was not severe and pervasive. [Dkt. 39 at 3.][2] The Court disagrees. Factors relevant to whether harassment is severe and pervasive include:

> (1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it is directed at the victim.

*Scaife*, 49 F.4th at 1116 (citation omitted). These factors favor Chillmon. Factor (5) is clearly met, as is factor (1) during Chillmon's first weeks on the job. Factors (2) and (4) also point in Chillmon's direction because a reasonable person would find overtly bigoted comments about immigrants highly offensive, and being harassed instead of trained could unreasonably interfere with job performance. Only factor (3) cuts against Chillmon because she alleges no physical threat or humiliation.

The Court also disagrees with Evergreen Park's assertion that the comments about Chillmon's accent or difficulty with English are not actionable. [*Contra* Dkt. 39 at 8.] The cases it relies on are inapposite and, in fact, help Chillmon. In *Hong v. Children's Memorial Hospital*, the Seventh Circuit explained that saying, "learn to speak English" "could be circumstantial proof of … discriminatory animus," but the plaintiff's claim failed on causation grounds. 993 F.2d 1257, 1265–66 (7th Cir. 1993).

---

[2]     Evergreen Park also argues that Walusek's and Snyder's conduct was not objectively offensive. [Dkt. 39 at 3.] The Court does not address this argument separately because offensiveness to a reasonable person is one factor relevant to whether conduct is severe and pervasive. *Scaife*, 49 F.4th at 1116.

7

And while in *Villarruel v. Mukasey*, the Seventh Circuit explained that saying, "people who are in America should speak English," "is neither an anti-Hispanic comment nor something that would permit a reasonable trier of fact to conclude that working conditions for Hispanic employees were materially worse than those for employees of other ethnic backgrounds," the hostile environment here was based on national-origin discrimination, not discrimination against Hispanic ethnicity. 266 F. App'x 473, 475–76 (7th Cir. 2008) (nonprecedential) (cleaned up). Neither case suggests that comments like Walusek's and Snyder's are never actionable.

But while these comments may have risen to the level of a hostile work environment, Evergreen Park cannot be held liable for them because it quickly rectified the issue in response to Chillmon's complaints. *See Brooks*, 39 F.4th at 441. After Walusek's hostility, Chillmon complained to Clarin, and she was reassigned to train under Snyder in August 2019. [Chillmon Dep. at 18:12–20:17; Dkt. 40-9 at 25–26.][3] Of course, Chillmon suffered harassment at Snyder's hands too, but she was then reassigned to Ivers, who did not discriminate against Chillmon. [Chillmon Dep. at 31:19–32:16.] Ivers gave Chillmon a largely positive review on September 16, 2019, and Chillmon agreed with the areas Ivers identified where Chillmon needed improvement. [Dkt. 40-9 at 33–37; Chillmon Dep. at 138:13–147:6.] Chillmon then began working on her own, and she believed that she had learned the skills necessary to do the job as well as any other clerk. [Chillmon Dep. at 148:1–:5, 177:19–178:10.]

---

[3]   Although Chillmon testified that Clarin initially said, "I am not changing the trainer" [Chillmon Dep. at 19:22–:24], this point is immaterial because it is undisputed that Chillmon was reassigned to Snyder.

By changing Chillmon's trainer, Evergreen Park took "reasonable steps to discover and rectify acts of harassment of its employees," fulfilling its duty to protect its employees from coworker harassment. *Trahanas*, 64 F.4th at 855 (cleaned up); *see Brooks*, 39 F.4th at 438 & n.9 (coworker's refusal to train the plaintiff based on her age could not support hostile environment claim when a higher-ranking supervisor provided the necessary training instead).[4] Thus, any hostile environment caused by Walusek's and Snyder's conduct early in Chillmon's employment is not actionable.

With Walusek's and Snyder's initial harassment off the table, none of the other coworker discrimination Chillmon identifies rises to the level of a hostile work environment. The only overtly discriminatory comments Chillmon identifies are Snyder calling her a "fucking immigrant"[5] under her breath one time and making "multiple comments about immigrants taking our jobs, and not being able to speak proper English, and comments along those lines." [Chillmon Dep. at 49:20–50:12, 228:4–:19; Dkt. 40-7 ("Ivers Dep.") at 54:9–55:4.] Chillmon testified that Kentra Thomas-Smith, another clerk, said she was "not going to succeed in life," ignored her, and refused to conduct normal shift changes with her. [Chillmon Dep. at 32:17–39:22.] Chillmon also reported an incident with Mike Tague, a lockup officer, who

---

[4]     Chillmon argues that neither Clarin nor anyone above him conducted a satisfactory investigation into her complaints, but this does not change the outcome with respect to Walusek's and Snyder's conduct. If Clarin's or Saunders's conduct rises to the level of a hostile environment, Chillmon may be able to recover based on that conduct, but not Walusek's and Snyder's harassment when they were Chillmon's trainers.

[5]     It is possible Snyder might have said "fucking ignorant" [Chillmon Dep. at 50:8–:12], but for purposes of summary judgment, the Court assumes she said "immigrant" because that better helps establish a hostile work environment based on Chillmon's national origin.

"stood up on his chair and started screaming … and yelling," telling Chillmon not to leave work for Thomas-Smith after a shift change. [*Id.* at 48:4–49:12.]

What Tague allegedly did was surely unpleasant, but Chillmon offers no evidence that he or Thomas-Smith acted with animus toward her national origin, and a reasonable jury could not infer such animus from their comments alone, however rude they may have been. *See Scaife*, 49 F.4th at 1117 (rejecting hostile work environment claim where supervisor "consistently yelled at" the plaintiff because she failed to show the harassment was based on a protected characteristic); *Brooks*, 39 F.4th at 441 ("[O]ther complaints [plaintiff] had about her coworkers' abusive conduct—swearing, refusing to follow her directions, using disrespectful language— were not focused on [any protected category] and thus could not create a hostile work environment on the basis of a protected category.").[6] Receiving the cold shoulder from Thomas-Smith (or Walusek and Snyder once they were no longer her trainers) cannot contribute to a hostile environment claim because "[s]nubbing by supervisors and co-workers is not actionable." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 382–83 (7th Cir. 2020) (cleaned up). That leaves Snyder's comments as the only remaining basis for a hostile environment based on coworker discrimination.

Isolated comments can sometimes create a hostile environment. *Scaife*, 49 F.4th at 1116 ("Because the N-word is egregious, we are not concerned with the

---

[6]     Ivers testified that, before Chillmon started working at Evergreen Park, she heard Tague mock individuals' accents and the way they spoke, but she could not give specifics or recall how many times or how recently Tague mocked people. [Ivers Dep. at 104:15–105:8.] This vague testimony alone is not enough to make it reasonable to infer that Tague was motivated by bias toward Chillmon's national origin when he yelled at her.

number of times the epithet is used. A one-time use of the epithet can in some circumstances warrant Title VII liability." (citations omitted)). But one-off comments seldom create a hostile environment. *See id.* at 1116–17 (explaining under the totality of the circumstances why the use of the N-word was not sufficient to create a hostile environment); *Hong*, 993 F.2d at 1266 ("Evidence of a supervisor's occasional or sporadic use of a slur directed at an employees' race, ethnicity, or national origin is generally not enough to support a claim under Title VII." (citations omitted)); *cf. Hall v. City of Chicago*, 713 F.3d 325, 330–31 (7th Cir. 2013) (noting this general principle but explaining that additional evidence allowed the plaintiff to survive summary judgment). The comments Snyder allegedly made are abhorrent, but the fact that these comments came from a coworker and only one was directed at Chillmon means that the work environment was not "permeated with discriminatory intimidation, ridicule, and insult." *Trahanas*, 64 F.4th at 853 (internal quotation omitted); *see Paschall v. Tube Processing Corp.*, 28 F.4th 805, 814–15 (7th Cir. 2022) (supervisor's use of a slur is more serious than a coworker's); *Hall*, 713 F.3d at 330–31 (isolated comments, especially those not directed at the plaintiff, often do not create a hostile environment). No reasonable jury could find that Chillmon's coworkers created a sufficiently pervasive and severe hostile environment based on her national origin for which Evergreen Park can be held liable.

## 2. Supervisor Harassment

The Court now considers Chillmon's hostile work environment claim to the extent it is based on harassment by her supervisors, Saunders and Clarin. Construed in Chillmon's favor, the record would allow a reasonable jury to find that Clarin

11

mistreated Chillmon based on her national origin and that his mistreatment was both objectively offensive and severe and pervasive. *See Trahanas*, 64 F.4th at 853. But Chillmon has not established a genuine dispute of material fact with respect to Saunders's alleged harassment.[7]

Evergreen Park attempts to downplay Clarin's conduct as mere rudeness that is not actionable under Title VII. [*See, e.g.*, Dkt. 39 at 5 ("[W]hile Clarin … may have treated her in a manner that was condescending, impatient, or made her life at work subjectively unpleasant, such conduct is not actionable."); Dkt. 57 at 2 ("She claims that Clarin was a 'bully' and would embarrass her by confronting her about mistakes in front of others, but such conduct is unprofessional at best.").] But Evergreen Park fails to seriously engage with the evidence supporting the inference that Clarin's hostility was based on Chillmon's national origin. Chillmon testified that shortly after she complained to Clarin about Walusek's behavior, he discovered handwritten notes on her desk and, in front of other employees, repeatedly asked, "[W]hat is this, Rabie? Seriously, what is this? … [E]verybody, is this even English? … Is this in English?" [Chillmon Dep. at 55:11–56:13.] Chillmon also testified that, on a "daily basis," Clarin would confront her about mistakes she made in the bulletin—typed in English—and

---

[7]     Chillmon has produced little evidence about harassment by Saunders and no evidence that could be construed as bias against her national origin. [*See* Dkt. 52 at 2–6 (no substantive argument about Saunders's conduct in hostile work environment section), 11 (conclusory argument that "Chief Saunders engaged in conduct that created a hostile work environment for Plaintiff," citing little evidence relevant to Saunders); *cf.* Dkt. 50 ¶¶ 59–61 (noting evidence about retaliatory conduct by Saunders but no evidence of national-origin bias).] Accordingly, a reasonable jury could not find that Saunders created an actionable hostile environment. *See Scaife*, 49 F.4th at 1117.

that most of this criticism occurred in front of other employees. [*Id.* at 57:13–:23.][8] While Evergreen Park acknowledges these comments, it argues that "ask[ing] if Chillmon's notes were in English" is not actionable, relying on *Hong*, 993 F.2d at 1265–66, and *Villarruel*, 266 F. App'x at 475–76 [Dkt. 39 at 8], but those cases do not stand for the proposition that comments about speaking English are never actionable.

A reasonable jury could find that animus toward Chillmon's national origin drove Clarin's criticism of her. Clarin knew that she was an immigrant,[9] and a jury could reasonably infer that his disproportionate public criticism of Chillmon's English skills and mistakes in the bulletin were motivated by her national origin. *See Hong*, 993 F.2d at 1265 ("[T]he statement, 'learn to speak English,' could be circumstantial proof of … discriminatory animus …."); *see also* 29 C.F.R. § 1606.1 (defining national origin broadly and including "linguistic characteristics"); *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1195 (9th Cir. 2003) ("Accent and national origin are obviously inextricably intertwined in many cases." (internal quotation omitted)). The evidence that Clarin's English-related comments were based on national-origin bias "in turn permits a jury to conclude that [national origin] played a part in all of

---

[8] Evergreen Park argues that Chillmon's allegations about Clarin "are vague and lack specificity which makes it impossible for this Court to determine the severity of her work environment" [Dkt. 39 at 3], but the cases it cites are distinguishable. In both *Brooks*, 39 F.4th at 441–42, and *Ladd v. Grand Truck W. R.R., Inc.*, 552 F.3d 495, 501 (6th Cir. 2009), the plaintiff made only broad generalizations about the alleged harassment, which were insufficient to allow a reasonable jury to find an actionable hostile environment. Here, in contrast, Chillmon gave specific examples of what Clarin said about her English skills and the errors in the bulletin and said he repeated those comments on a daily basis. That testimony is sufficient to allow a jury to evaluate the effect of his comments.
[9] Evergreen Park attempts to dispute this point, but there is ample evidence from which a jury could find that Clarin knew Chillmon was an immigrant. [*See* Dkt. 50 ¶ 4.]

[Clarin's] actions." *Hall*, 713 F.3d at 333–34 (one comment containing gender-biased language permitted such an inference, even though "most of [the] conduct was devoid of gender-specific indicia"); *see also Alamo v. Bliss*, 864 F.3d 541, 550–51 (7th Cir. 2017) (allegation of racial slurs allowed the plaintiff's food being thrown out and physical altercations to support hostile environment claim). Thus, a jury could consider Clarin's other behavior, such as requiring Chillmon to ask permission to use the restroom, making employees submit questions their peers asked in writing, and monitoring Chillmon's phone calls [Chillmon Dep. at 58:3–62:19], as contributing to the hostile environment, even if that conduct would not be actionable in the absence of evidence of bias against her national origin, *see Hall*, 713 F.3d at 333–34.

Considering the totality of Clarin's conduct, a jury could find that the hostility Chillmon faced was severe and pervasive.[10] Factors to consider include:

> (1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it is directed at the victim.

*Scaife*, 49 F.4th at 1116 (citation omitted). Only factor (3) cuts against Chillmon; she has offered no evidence of physically threatening or humiliating conduct. The harassment was frequent, factor (1): early on, Clarin began criticizing her English skills and errors in the bulletin daily; he later instituted the requirements that

---

[10] Chillmon's coworkers' conduct does not contribute to the severe and pervasive analysis. Walusek's and Snyder's harassment while they were training Chillmon is not actionable because Evergreen Park remedied that misconduct. *See Brooks*, 39 F.4th at 441. Snyder's subsequent derogatory comments are only actionable in a supervisor harassment claim if Chillmon demonstrates that her coworker's harassment is logically tied to her supervisor's. *Scaife*, 49 F.4th at 1118. She makes no argument to this effect.

14

questions be submitted in writing and Chillmon ask permission to use the bathroom; and during the January 23, 2020 meeting, Clarin screamed at her. A reasonable jury could find Clarin's conduct quite offensive, factor (2), because he berated Chillmon about her English skills and criticized her alone for mistakes others also made. Further, Clarin exercised a disproportionate degree of control over Chillmon relative to her colleagues, requiring her, but not others, to ask for permission to use the bathroom and listening to her calls alone. A jury could also find that Clarin's conduct unreasonably interfered with Chillmon's job performance, factor (4), since she testified that the purpose of requiring submitting questions in writing was to report others' mistakes—if so, an employee might fear punishment and not seek needed help. Finally, Chillmon testified that the harassment was directed at her, factor (5), and evidence indicates that Clarin stopped requesting clerks report others' mistakes after Chillmon was fired. [Ivers Dep. at 81:3–82:13.] From this evidence, a jury might reasonably conclude that there was a severe and pervasive hostile environment.

With respect to her hostile work environment claim based on Clarin's harassment, Chillmon has established a triable issue of fact.

## B. Discrimination

Next, the Court turns to Chillmon's discrimination claim. At the summary judgment stage, the Court "look[s] to see whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [national origin] caused the discharge or other adverse employment action." *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023) (cleaned up). A plaintiff may either "prove discrimination in a holistic fashion" under *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016),

or rely on the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework, "which gives the plaintiff the initial burden to establish a prima facie case of discrimination, after which the burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual." *Wince*, 66 F.4th at 1040 (cleaned up). Chillmon appears to have chosen the holistic approach, as she does not cite the *McDonnell Douglas* framework or engage with its requirements.[11]

Under the holistic approach, the Court asks whether, looking at the record as a whole, "a reasonable jury could conclude that the plaintiff suffered the adverse employment action because of his membership in a protected class." *Reives v. Ill. State Police*, 29 F.4th 887, 892 (7th Cir. 2022) (citation omitted). Seventh Circuit precedent recognizes three general categories of adverse employment actions: "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce further career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Id.* at 894 (internal quotation omitted). Things like "negative performance

---

[11]    If Chillmon intended to pursue both methods, which she can, *see Wince*, 66 F.4th at 1040–41, she has waived her *McDonnell Douglas* argument by failing to develop it, *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) ("Seventh Circuit precedent is clear that perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived." (cleaned up)). While Chillmon discusses that she was treated worse than non-immigrants and invokes the concepts of a similarly situated employee and pretext, her discussion relates to proving discrimination holistically or her other claims. [*See* Dkt. 52 at 3–6, 8, 12–15.] She does not articulate a prima facie case of discrimination or discuss why any non-immigrants are "directly comparable to [her] in all material respects." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (cleaned up). This is waiver.

evaluations … do not constitute adverse employment actions" if "unaccompanied by some tangible job consequence." *Id.* (cleaned up). The parties agree that only Chillmon's termination and her suspension constitute adverse employment actions, but the other discriminatory conduct she identifies may constitute evidence. [Dkt. 39 at 10; Dkt. 52 at 11.] The parties also agree that Saunders suspended and terminated Chillmon. [Dkt. 50 ¶¶ 69, 79.] Thus, because she does not pursue a cat's-paw theory of liability,[12] the only question is whether there is sufficient evidence for a jury to find that Saunders suspended or terminated Chillmon because of her national origin.

This issue turns on pretext.[13] Evergreen Park has provided nondiscriminatory reasons that Saunders suspended and terminated Chillmon, so her claim fails unless a reasonable jury could find that these reasons were pretextual. *See Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013) ("[I]f there is no evidence of pretext, then [the] non-discriminatory justifications for firing [the plaintiff] must be believed, which necessarily precludes liability under Title VII." (citation omitted)). Chillmon has failed to produce sufficient evidence of pretext, so Evergreen Park is entitled to summary judgment on this claim.

---

[12]     Under a cat's-paw theory, a plaintiff attempts to prove that an employee without the authority to fire the plaintiff of impose some other adverse employment action "uses a formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Bragg v. Munster Med. Rsch. Found., Inc.*, 58 F.4th 265, 273 (7th Cir. 2023) (internal quotation omitted). Chillmon has waived this theory by failing to marshal evidence or make any argument to support it. *Rock Hemp*, 51 F.4th at 704.

[13]     Formal parts of the *McDonnell Douglas* framework include whether the defendant had a nondiscriminatory reason for an adverse employment action and whether that reason was pretextual, *Wince*, 66 F.4th at 1040, but this evidence is also relevant under the holistic approach, *see Sandefur v. Dart*, 979 F.3d 1145, 1155 (7th Cir. 2020) (applying these standards to an analogous Americans with Disability Act discrimination claim).

### 1.     Saunders's Nondiscriminatory Reasons

Saunders's proffered reason to suspend Chillmon is that she was insubordinate during a January 23, 2020 meeting with Clarin and Salazar. [Dkt. 50 ¶ 69 (Chillmon agreeing this was the stated reason).][14] Saunders found that Chillmon was insubordinate because she failed to "take ownership with Clarin on the mistakes in the bulletin" and "argued about" those mistakes the meeting. [Dkt. 45 ("Saunders Dep.") at 209:11–:14.] Saunders relied on memos from Clarin and Salazar and reviewed a view of the meeting. [*Id.* at 205:12–207:19.] Clarin stated that Chillmon was "very defensive and aggressive" and made statements including, "I know what's going on here and so do you," and "if you want to fire me, go ahead, I'm not quitting." He added that Chillmon "said 'fire me' at least 10 times." [Dkt. 40-9 at 53–54.] Salazar's memo reported that Chillmon "became aggressive and began talking in a loud voice that she was being singled out, that everyone was only out to get her, and that if her work was so bad to go on and fire her." [*Id.* at 55–56.] Both memos said that Salazar said Chillmon was being "extremely insubordinate." [*Id.* at 53–56.] The video of the meeting lacks sound and obscures Clarin and Salazar from view, but it is not inconsistent with the memos; it shows Chillmon shaking her head and gesturing frequently. [*See* Dkt. 44 (video 1351 part 1).] Saunders testified that Chillmon had the opportunity to discuss the alleged insubordination, but she said

---

[14]     In her deposition, Chillmon suggested that she was separately suspended for mistakes in the bulletin [Chillmon Dep. at 70:5–:23], but a reasonable jury could not find that she was suspended for this reason. Chillmon was given a written reprimand for the mistakes in the bulletin. [Dkt. 40-9 at 61–62 (reprimand), 63–64 (suspension).]

nothing; Chillmon does not recall speaking at the meeting. [Saunders Dep. at 206:11–:17, 208:19–:22; Chillmon Dep. at 198:16–:17.]

Saunders's nondiscriminatory reason for terminating Chillmon is that she made a false report about Snyder. [Dkt. 50 ¶¶ 79–80 (Chillmon acknowledging this proffered reason).] Saunders terminated Chillmon on March 31, 2020 for claiming that Snyder told her to "shut up" on March 25, 2020. [Dkt. 40-9 at 80–81; Saunders Dep. at 234:24–235:15.] Chillmon reported this incident to Donovan, who reviewed video footage, with audio, of the incident and prepared a memo, which stated:

> I heard the following conversation between Clerks Chillmon and Snyder. It should be noted the other people in the area are speaking at the same time:
>
> - Clerk Chillmon: "Why should I shut up"
>
> - Clerk Snyder: "Are you talking to me? Who are you talking to?"
>
> - Clerk Chillmon: "No I was talking to Jimmy"
>
> - Clerk Snyder "I thought you were talking to me, because I didn't say anything.
>
> There is no further dialogue between Clerk Chillmon and Clerk Snyder. At no time is Clerk Snyder heard to say "Shut-Up" to anyone.

[Dkt. 40-9 at 75–76.] Saunders reviewed Donovan's memo and watched the video of the incident. [Saunders Dep. at 228:20–229:2; Dkt. 42 (video 177).] Saunders did not interview Chillmon or Snyder, but a captain and a detective spoke to them separately about the incident. [Saunders Dep. at 234:19–:23; Dkt. 40-9 at 76.] Based on this information, Saunders concluded that Chillmon had lied when she said she heard Snyder tell her to shut up. [Saunders Dep. at 228:7–:19 (agreeing that the "video is

conclusive" and denying that "it's possible that Rabie Chillmon heard Laurie Snyder say shut up to her").]

On their face, these reasons are not discriminatory, so to survive summary judgment, Chillmon must produce sufficient evidence for a jury to find that the reasons were pretextual. *Hitchcock*, 718 F.3d at 738.

### 2.    Whether Chillmon Can Show Pretext

A reasonable jury could not find that Saunders's reasons for suspending or terminating Chillmon were pretextual. Some of Chillmon's arguments go to the accuracy of Saunders's conclusions [*e.g.*, Dkt. 52 at 13–14 (arguing that the video does not unequivocally establish that Chillmon lied about Snyder telling her to shut up)], but "[t]he question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered for the adverse action," *Liu v. Cook County*, 817 F.3d 307, 316 (7th Cir. 2016) (cleaned up). "A plaintiff may show a genuine dispute of fact on pretext by identifying such weaknesses, implausibilities, inconsistencies, or contradictions in a stated reason that a reasonable trier of fact could find it unworthy of credence." *Id.* (cleaned up).

Video evidence plays a different role than when a video is offered to prove what occurred. *Kailin v. Village of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023) ("Video evidence … can eviscerate a factual dispute only when the video is so definitive that there could be no reasonable disagreement about what the video depicts." (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007))). In the pretext context, the question is whether the employer honestly believed the nondiscriminatory justification, *Liu*, 817 F.3d at 316, so the Court views the video evidence not to determine whether a reasonable

jury could believe Chillmon's version of events, but whether a jury could interpret the video as evidence that Saunders did not honestly believe his stated reason. For the video itself to constitute evidence of pretext, it is not enough that the footage is consistent with Chillmon's account; it must be inconsistent with Saunders's.

Saunders's belief that Chillmon lied about saying she heard Snyder say, "shut up," is not so inconsistent with the March 25, 2020 video evidence that a jury could conclude, from his proffered reason alone, that he was lying. Donovan reported that Snyder could not be heard saying, "shut up" [Dkt. 40-9 at 75–76], and Saunders reasoned that because Snyder was not facing Chillmon, Chillmon couldn't possibly have heard Snyder say, "shut up," and have it not captured on the video [*see* Saunders Dep. at 235:5–:9; Dkt. 42 (video 177)]. Similarly, Chillmon argues that the video from January 23, 2020 "does not show [her] being aggressive or defensive and [Evergreen Park's contrary argument] is purely speculative given the lack of sound and obstructed views" [Dkt. 50 at 29 n.3]. But Chillmon's behavior in the video of the January 23, 2020 meeting is consistent with Clarin's and Salazar's reports. [*See* Saunders Dep. at 209:11–:14; Dkt. 40-9 at 53–56; Dkt. 44 (video 1351 Part 1).] Saunders's reasons for suspending and terminating Chillmon are not so inconsistent with the evidence that was before him that a jury could reasonably conclude from his statements alone that his reasons were pretextual.[15]

---

[15]    Chillmon also argues that "she was terminated for *following* Defendant's policy by letting her harasser know that her comment was unwelcome." [Dkt. 52 at 13.] This argument refers to the fact that one count in her termination notice was for failing to "conduct official business through Chain of Command" [Dkt. 40-9 at 81], but Evergreen Park's harassment policy encourages employees "to inform the [harassing] individual that his or her behavior is

Chillmon must attempt to establish pretext through other evidence, but she cannot do so. As noted above, there is no evidence that Saunders acted out of animus toward Chillmon's national origin. Unlike Clarin and her coworkers, no evidence shows that Saunders spoke negatively about immigrants or Chillmon's national origin, accent, or English skills. Chillmon argues "that she was treated less favorably than her non-immigrant co-workers," but that portion of her brief contains no discussion of Saunders's conduct. [Dkt. 52 at 8 (citing Dkt. 52 at 3–6).] She also argues that "Clarin and Saunders were dismissive, frustrated and ignored Plaintiff's complaints of discrimination and both showed a preference for the well-being of the non-immigrant harassers, Walusek and Snyder," but almost all the actions she describes were taken by Clarin, not Saunders. [*See id.* at 12–13.] The exceptions are that Saunders believed that Deputy Chief Wall showed favoritism toward Chillmon and removed a write-up from Walusek's file after she was insubordinate [*id.* at 13], but no evidence links either incident to national-origin bias. Further, she argues that Ivers's termination—on the same day as Chillmon, also for making allegations that Saunders deemed to be false—is "suspect" [Dkt. 52 at 14 n.7], but as with her own termination, Chillmon fails to present evidence of a discriminatory motive on Saunders's part. A reasonable jury could not conclude that Saunders's reason to

---

unwelcome, offensive, unprofessional or inappropriate." [Saunders Dep. at 241:20–242:9.] Chillmon appears to be correct about this point, but Saunders being mistaken about one reason for terminating Chillmon does not, by itself, permit the inference that the reason to terminate her was pretextual. *See Liu*, 817 F.3d at 316.

suspend or terminate her was a pretext for discrimination on the basis of her national origin.[16]

The record lacks sufficient evidence of pretext, so the non-discriminatory justifications for firing Chillmon must be believed, which necessarily precludes liability under Title VII. *Hitchcock*, 718 F.3d at 738. Evergreen Park is therefore entitled to summary judgment on Chillmon's discrimination claim.

## C.    Retaliation

Finally, the Court considers Chillmon's retaliation claim. To defeat summary judgment on this claim, Chillmon "must offer evidence from which a reasonable jury could find: (1) [s]he engaged in an activity protected by the statute; (2) [s]he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022) (cleaned up). It is undisputed that Chillmon engaged in protected activity by reporting national-origin discrimination to her supervisors and filing an EEOC complaint [Dkt. 39 at 13], but the parties disagree about the other elements.

### 1.    Adverse Employment Actions

The adverse employment action requirement is easier to satisfy for a retaliation claim than a discrimination claim; it "is defined as an action that a

---

[16]    In the hostile environment section of her brief, Chillmon points out that Saunders removed Wall and Sergeant Trujillo, who she thought were fair, from supervisory roles in the records department. [Dkt. 52 at 8.] Even if she intended this argument also to apply to her discrimination claim, it would not support an inference of pretext without evidence that he was motivated by Chillmon's national origin. *See Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105–06 (7th Cir. 2012) (explaining that evidence of bias does not support an inference of unlawful discrimination without evidence of a discriminatory motive).

reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Lesiv*, 39 F.4th at 911–12 (cleaned up). But "the actions must rise above trivial harms, such as petty slights or minor annoyances that often take place at work and that all employees experience, which do not qualify as materially adverse." *Id.* at 912 (cleaned up). Although the only adverse employment actions for purposes of Chillmon's discrimination claim were her suspension and termination, Chillmon argues that other conduct by Clarin and Saunders constituted adverse actions for her retaliation claim. [Dkt. 52 at 14.]

The possibility of an adverse event that never comes to pass is seldom a materially adverse employment action. *See Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016) (no adverse employment action for "threats of unspecified disciplinary action" that "had no effect on [the plaintiff's] compensation or career prospects"); *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1120–21 (7th Cir. 2009) (no adverse employment action where suspension was imposed but never served). Several incidents Chillmon argues were adverse employment actions fall into this category. She argues she was "subjected to harsher scrutiny and discipline" [Dkt. 52 at 14], but other than her suspension and termination, she never received more than a written reprimand, so the scrutiny did not materialize into an adverse employment action. Likewise, the harassment and mocking by Clarin, while actionable as a hostile work environment claim, never included a concrete consequence that could rise to the level of a materially adverse action. A reasonable jury could not find that these actions are more adverse than those in *Poullard* or *Nagle*.

24

Saunders's actions in the January 6, 2020 meeting, however, could constitute a materially adverse employment action. Chillmon testified that he called her into the meeting, told her that he didn't believe her complaints of discrimination, and said she would have to take a polygraph test for him to believe her. [Chillmon Dep. at 65:4 –:13.] Saunders went on, saying "I'm going to make sure you are going to have a very hard time to find a good job." [*Id.* at 65:14–:16.] A jury could interpret that comment as a threat: if Chillmon continued to press her complaints, Saunders would retaliate by firing her and sabotaging her future job prospects. Such a threat, coming from the chief of police, goes beyond a vague "threat[ ] of unspecified disciplinary action," *Poullard*, 829 F.3d at 856, and could dissuade an employee from engaging in protected activity, *see Lesiv*, 39 F.4th at 911–12. That is enough for an adverse employment action in the retaliation context.

Evergreen Park's counterarguments are unavailing. First, it contends that Saunders's statement was not an adverse action because it was "ambiguous" and was not accompanied by any concrete consequence at that meeting. [Dkt. 39 at 10.] True, but at summary judgment the Court must draw reasonable inferences in Chillmon's favor, and the combination of requiring a lie detector test and threatening termination and sabotage of future employment could reasonably be interpreted as a genuine, specific threat. While "unfulfilled threats that result in no material harm cannot be considered an adverse employment action under Title VII," *Lewis v. Wilkie*, 909 F.3d 858, 869 (7th Cir. 2018) (internal quotation omitted), if a jury found that Saunders's threat would dissuade a reasonable employee from engaging in protected

activity, that itself is a material harm, even if Saunders never carried out the threat, *see Lesiv*, 39 F.4th at 911–12.

Second, Evergreen Park points out that Saunders also told Walusek and Snyder that they would have to take polygraph tests and that he has used polygraphs in previous investigations. [Dkt. 39 at 8.] Again, true—the mere fact that Saunders told Chillmon she would need to take a lie detector test is not an adverse employment action, and Saunders's may simply have meant that if Chillmon was lying and he fired her, prospective employers would be unlikely to hire her when they found out why she was fired. But a jury could also reasonably interpret this evidence as Saunders intending to threaten Chillmon by requiring a polygraph test and that his threat would dissuade a reasonable person from pursuing a complaint of discrimination. The Court cannot make that determination at summary judgment; a jury must do so.

Third, Evergreen Park argues that the fact that Chillmon was not, in fact, deterred from making complaints and filing an EEO charge indicates she did not suffer an adverse employment action. [Dkt. 39 at 13.] It cites *Lucero v. Nettle Creek School Corp.*, which indicated it was relevant that the allegedly retaliatory action did not dissuade others from engaging in protected activity, but that was not the most significant reason the plaintiff's claim failed. *See* 566 F.3d 720, 729 (7th Cir. 2009) ("More to the point, … [the plaintiff] was not reassigned to a position consisting of objectively less desirable duties."). And more recently, the Seventh Circuit rejected the argument that refusing to give in to retaliatory conduct prevents an employee

from bringing a retaliation claim. *Lesiv*, 39 F.4th at 913. Applying that logic here, the fact that Chillmon continued complaining about discrimination after Saunders's threat does not prevent that threat from being an adverse employment action.

Therefore, in addition to her suspension and termination, a reasonable jury could find that Saunders's threat was an adverse employment action.

### 2. Causation

To satisfy the causation standard, Chillmon must produce sufficient evidence to allow a jury to find that "a retaliatory motive was a but-for cause of the challenged employment action." *Id.* at 915 (cleaned up). She easily meets this standard with respect to Saunders's threat, which was made in a meeting about her statutorily protected activity. Had Chillmon not complained of national-origin discrimination, there would have been no meeting and, therefore, no threat. If a jury found that Saunders's statement was a threat, it could take the next step and find that he had a retaliatory motive. *See id.*

With respect to her suspension and termination, however, Chillmon cannot show causation for the same reason her discrimination claim fails: the record lacks evidence to support a finding that Saunders's proffered reasons for suspending and terminating her were pretextual. *See Liu*, 817 F.3d at 316–17 (analyzing retaliation for discrimination and retaliation claims identically). Chillmon argues that suspicious timing of these disciplinary actions indicates pretext [Dkt. 52 at 15], but

even assuming the timing was suspicious,[17] the lack of supporting evidence of discriminatory or retaliatory intent is not enough to establish pretext, *see Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959 (7th Cir. 2021) ("Suspicious timing is rarely enough to create a triable issue." (cleaned up)). Nor is the fact that a jury could find that Saunders had a retaliatory motive for his earlier threat sufficient to permit the inference that his later actions had the same motivation. Insubordination and lying are valid reasons to suspend and terminate an employee, and there is insufficient evidence to allow a jury to find that those reasons were pretextual. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) ("[I]nappropriate workplace activities are not legitimized by an earlier-filed complaint of discrimination." (citation omitted)).

Chillmon has raised a triable issue of fact on her retaliation claim with respect to Saunders's alleged threats, but not her suspension or termination.[18]

---

[17]  The Court is skeptical that the timing was suspicious. Chillmon was suspended on January 24, 2020, one day after the January 23 meeting with Clarin and Salazar, and she was terminated on March 31, 2020, after the March 25 incident involving Snyder. Acting on disciplinary infractions within a few days is expected, not suspicious, timing.

[18]  The Court's ruling that other incidents cannot support Title VII liability does not mean that evidence regarding those incidents will be entirely inadmissible at trial. Those issues will be decided through motions *in limine* and objections at trial.

## IV.    Conclusion

Evergreen Park's motion for summary judgment is granted in part and denied in part. [Dkt. 38.] The motion is denied with respect to Chillmon's hostile work environment claim to the extent that it is based on Clarin's harassing conduct and Chillmon's retaliation claim to the extent that it is based on Saunders's conduct during the January 6, 2020 meeting. The motion is granted with respect to the discrimination claim in full and the hostile work environment and retaliation claims in all other respects.

Enter: 20-cv-7379
Date:  September 14, 2023

_____
Lindsay C. Jenkins
United States District Judge